IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **JACKIE COFFEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No. 15-cv-060-CJP**[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## **MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Jackie Coffey seeks judicial review of the final agency decision denying the application of her late father for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff's father Curtis Westerman applied for benefits in February 2012, alleging disability beginning on September 30, 2011.   After holding an evidentiary hearing, ALJ Lee Lewin denied the application in a written decision dated August 23, 2013.  (Tr. 8-19).   The Appeals Council denied review, and the August 23, 2013, decision of the ALJ became the final agency decision.   (Tr. 1).

Mr. Westerman passed away on December 4, 2013.   See, Doc. 21, p. 1.

Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 12.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.  The ALJ improperly classified Mr. Westerman's high blood pressure as a non-severe impairment.

2.  The ALJ failed to include the effects of Mr. Westerman's right hand tremor in the RFC assessment.

3.  The medical expert refused to answer questions in terms of specific work-related functional abilities.

4.  The ALJ asked the vocational expert a hypothetical question that did not state limitations in terms of specific work-related functional abilities.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.[2]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

---

[2] Mr. Westerman also applied for Supplemental Security Income (SSI) benefits.   Plaintiff recognizes that the claim for SSI is now moot.   See, Doc. 21, p. 1.

2

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot

3

perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.   *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.... If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Mr. Westerman was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d

1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

At the same time, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Lewin followed the five-step analytical framework described above.   She determined that claimant had not worked at the level of substantial gainful activity since the alleged onset date and that he was insured for DIB through December 31, 2016.

The ALJ found that Mr. Westerman had severe impairments of degenerative disc disease of the lumbar spine; obesity; history of discectomy and fusion in the cervical spine; history of right carpal tunnel syndrome release; osteoarthritis of the knees and hips; and tremors in the right hand.   She further determined that his impairments did not meet or equal a listed impairment.

The ALJ found that Mr. Westerman had the residual functional capacity (RFC) to perform work at the light exertional level with some physical limitations. Based on the testimony of a vocational expert, the ALJ concluded that Mr. Westerman could not do his past work, but he was not disabled because he was able to do several jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record

5

is directed to the points raised by plaintiff.

1.    **Agency Forms**

Mr. Westerman ("claimant") was born in 1960 was 51 years on the alleged date of onset.   (Tr. 195).   He stated that he was unable to work because of cervical radiculopathy and cervical fusion, lower back injury and lumbar radiculopathy, tremor in dominant right hand, carpal tunnel syndrome, and high blood pressure. He was 5'11" tall and weighed 212 pounds.   (Tr. 199).

Claimant had worked as a welder/laborer in manufacturing plants from 1995 through September 11, 2011.   (Tr. 200).

In a Function Report submitted in March 2012, plaintiff said that he spent most of the day in a recliner due to pain.   All exertional activity was limited because of pain in his shoulders, neck, leg and back.   His hands shook, the right hand more than that left.   His hands shook so much that he could not turn the pages of a book.  (Tr. 213-219).   In June 2012, he reported that his balance was affected and he had to use a cane.   (Tr. 224).

2.    **Evidentiary Hearing**

Mr. Westerman was represented by an attorney at the evidentiary hearing on August 1, 2013.   (Tr. 32).

Claimant testified that he lived with his fiancé in an apartment.   He did no household chores.   He mostly sat in a recliner all day.   He was able to walk less than a block.   He had been using a cane for about a year.    (Tr. 38-40).   He stopped working after he hurt his back in a work accident.   (Tr. 44-45).

Mr. Westerman testified that he had pain in his low back and shoulders.   He

had pain from arthritis in his knees and hips.  His legs were numb.  (Tr. 45-46).

He had carpal tunnel surgery on his right arm, but his fingertips were numb.  (Tr.

50).  He had a tremor in his right hand since neck surgery in 2008.  (Tr. 55).

He was being treated by his family doctor.  He had not been to a pain

specialist because he had no insurance.  (Tr. 53).

Dr. Sheldon Slodki testified as medical expert.  He is board certified in

internal medicine.  He testified based on a review of the medical records.  (Tr.

55-56).  Dr. Slodki testified that claimant did not meet or equal a listing.  He

agreed with the state agency consultant's RFC assessment of light work with

postural and manipulative limitations.  (Tr. 59).  Lumbar and cervical MRIs

showed mild findings.  The record did not support the symptoms that were being

alleged by Mr. Westerman.  (Tr. 61).  He had no motor loss or sensory loss, and

radiologic findings were "relatively mild."  There was no MRI or x-rays of the

shoulders.  (Tr. 63).

Dr. Slodki testified that the hand tremor "had not been developed" in the

medical records.  There was no evaluation by a neurologist.  Claimant had

apparently worked with the tremor, since he said it was present since 2008.  Dr.

Slodki said he did not find "documentation in the record to support any marked

reduction in use of the hand due to the tremor."  (Tr. 64).

Dr. Slodki acknowledged that the consultative examiner, Dr. Feinerman,

noted a reduced range of motion of both shoulders.  Dr. Slodki testified that was

residual from the neck surgery.  He said claimant would have a "mild" limitation in

reaching.  (Tr. 65-68).  Dr. Slodki agreed that he should to be limited to

7

occasional reaching in all directions with the right upper extremity and frequent reaching in all directions with the left.   (Tr. 74-75).   He was also limited to occasional gross manipulations with the right hand and frequent gross manipulations with the left hand.   (Tr. 76).

Claimant's counsel asked Dr. Slodki some questions about the cervical range of motion as measured in a functional capacity evaluation done in July 2013, referred to as Exhibit 12F at the hearing.   See, Tr. 69.   Dr. Slodki testified that "All people who have a fusion have decreased range in rotational ability with the neck."   He said it mostly affected them while driving as they have to turn the body to see where they are going.   Dr. Slodki was asked what functional limitation there would be from the cervical spine.   He testified that it was "mild limitation in the neck mobility."   He did not specify any particular functional limitation except to note that normal cervical rotation is 60 degrees and Mr. Westerman had 45 degrees on the left and 50 on the right.   He characterized this as 15% reduction on the left and 5% reduction on the right.   (Tr. 77-80).

A vocational expert (VE) also testified.   The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the light exertional level, limited to no climbing of ladders, ropes or scaffolds; only occasional climbing of ramps and stairs; occasional stooping, kneeling, crouching, crawling, balancing and twisting; frequent reaching in all directions with the left arm; occasional reaching in all directions with the right arm; frequent gross manipulations with the left hand; occasional gross manipulations with the right hand; 15% reduction in left

cervical rotation; 5% reduction in right cervical rotation; and use of a cane for stability.   The VE testified that this person could not do plaintiff's past relevant work.   He could, however, do jobs that exist in significant numbers in the national economy.   Examples of such jobs are usher, attendant, and rental consultant. (Tr. 85-87).

### 3.   Medical Treatment

In June 2008, Mr. Westerman underwent discectomy and fusion surgery at C5-6 and C6-7, as well as a right carpal tunnel release.     (Tr. 274-277).

Claimant began seeing primary care physician James Krieg, M.D, in October 2010 for treatment of high blood pressure.   Dr. Krieg prescribed medication.   (Tr. 285).

The alleged onset of disability is September 30, 2011.

Mr. Westerman saw Dr. Krieg in October 2011, complaining of low back pain since a work injury.   (Tr. 283).   An MRI showed small circumferential bulge with small herniation at L1-2, L3-4, and L5-S1;   subligamentous herniation at L2-3; and small bulge at L4-5.   (Tr. 287-288).   X-rays of the cervical spine showed mild degenerative disc disease at C4-5, interbody disc fusion at C5-6 and C6-7, and foraminal narrowing, most severe on the right side at C4-5 but also at C5-6 and C6-7.   (Tr. 289).

In December 2011, Dr. Krieg noted that physical therapy was giving him some relief, but he still had numbness in the left leg.   His right shoulder was "a bit sore to ROM" and hand grip on the right was weaker than the left.   He had "generalized tenderness in the lower lumbar region aggravated with ROM or even

light touch." Straight leg raising was negative. They were waiting for workers' compensation to authorize treatment by a pain management specialist. Dr. Krieg prescribed Lortab (hydrocodone). (Tr. 282). Authorization to see a pain management specialist was denied on September 7, 2011, until he was seen the workers' comp doctor again. (Tr. 281). It is unclear who the workers' comp doctor was, and there are no treatment records from a workers' comp doctor.

Mr. Westerman called Dr. Krieg's office to get a refill of hydrocodone on January 5, 2012. He "repeatedly yelled and used foul language," so he was "dismissed." (Tr. 281).

The only other treatment records are from primary care physician David Walls, M.D. The first office visit is dated January 17, 2012. However, Mr. Westerman had evidently been seen by Dr. Walls in the past, because there are notations regarding scheduling a nerve conduction study back in 2008. (Tr. 297).

On January 17, 2012, Mr. Westerman complained to Dr. Walls of pain in his back and shoulders and that his right hand "draws up." Dr. Walls noted that his right arm was weaker. He prescribed hydrocodone. His blood pressure was 150/90. (Tr. 297).

In February 2012, Mr. Westerman told Dr. Walls that he was filing for disability. The assessment on that visit was disc disease. Dr. Walls prescribed a reduced dose of hydrocodone. (Tr. 296). The prescription was refilled in March and April 2012. (Tr. 302).

Dr. Adrian Feinerman performed a consultative examination on May 10, 2012. He reviewed some office notes from Dr. Krieg, as well as the lumbar MRI

and cervical x-rays from October 2011.   Mr. Westerman complained of low back pain, numbness in his legs, neck pain radiating into his right arm, shaking of his right hand, and pain in his knees, hips and shoulders.   He had a history of hypertension without end organ damage.   He was taking hydrocodone.   On exam, his blood pressure was 170/120, and he was advised to follow up with his doctor. He was 5'11" and weighed 238 pounds.   He had a decreased range of motion of the shoulders.   Grip strength was strong and equal bilaterally.   He kept his right hand "clinched."   Range of motion of the cervical and lumbar spine was decreased. Ambulation was normal without an assistive device.   He had "intermittent shaking of [the] right upper extremity."   Muscle strength was normal throughout with no muscle spasm or atrophy.   Fine and gross manipulation were normal.   He had moderate difficulty tandem walking, standing on toes, standing on heels, and in squatting and arising.   Sensory examination was normal using vibration, light touch and pinwheel.   Straight leg raising was negative in both the sitting and supine positions.   Dr. Feinerman's report states that normal cervical rotation to the left and to the right is 80 degrees.   He measured Mr. Westerman's cervical rotation in both directions to be 30 degrees.   (Tr. 305-313).

Mr. Westerman returned to Dr. Walls in November 2012.   He complained of neck and low back pain.   His blood pressure was 170/110.   Dr. Walls refilled his hydrocodone but did not order any blood pressure medication.   No findings were noted on exam with regard to his back or neck.   (Tr. 342).   When Mr. Westerman returned in January 2013, his blood pressure was 186/100.   On exam, Dr. Walls noted overall good posture and described the hips as "benign."   He noted

11

tenderness and decreased range of motion in the lumbar spine.   Dr. Walls planned a neurosurgical consult after further testing.   He did not prescribe any treatment for high blood pressure.   (Tr. 341).

In May 2013, Dr. Walls diagnosed essential hypertension and prescribed Hydrochlorothiazide (a diuretic) and potassium chloride ER.[3]   (Tr. 339).

The last visit with Dr. Walls was in June 2013.   Mr. Westerman denied complaints related to hypertension, including chest pain/pressure, shortness of breath, swelling, exercise intolerance, fatigue, near-syncope/dizziness, syncope, and palpitations.   His blood pressure was 190/108.   Dr. Walls noted that he presented with back pain which was alleviated with Vicodin.   On exam, he described the spine exam as "normal" and noted tenderness of the lumbar spine with normal gait and station.   The patient was to return in three months.   Under "plan," Dr. Walls wrote, "Will do surgery when able."   (Tr. 337-338).

Dr. Walls prescribed a functional capacity evaluation in July 2013.   (Tr. 344).   Occupational therapist Andy Vitale attempted to perform this evaluation on July 26, 2013.   However, material handling and strength were not tested because Mr. Westerman's resting blood pressure was 190/110.   Mr. Vitale noted that he had limited range of motion of the cervical spine, shoulders, elbows, wrists and lumbar flexion.   Cervical rotation was limited to 45 degrees to the left and to 50 degrees to the right.   Normal rotation was said to be 60 degrees.   (Tr. 347).

## Analysis

---

[3] See, http://www.health.harvard.edu/family-health-guide/potassium-lowers-blood-pressure, visited on August 4, 2016.

The Court first notes that plaintiff Jackie Coffey is the claimant's daughter. A death certificate attached to the original complaint, Doc. 2, indicates that Mr. Westerman passed away on December 4, 2013, and that he was divorced at the time of his death.   The immediate cause of death was arteriosclerotic and hypertensive cardiovascular disease.

42 U.S.C. §404(d) sets forth an order of preference for payment of disability benefits due where the disabled beneficiary has died.   In a nutshell, where there is no surviving spouse, the child or children of the beneficiary are next in line.   The record before the Court does not reveal whether Jackie Coffey is the sole surviving child of Mr. Westerman.   Because the Commissioner has not raised an issue as to whether Ms. Coffey is the proper party to bring suit, the Court will assume that she is.

Plaintiff's first argument is a non-starter.   She argues that the ALJ should have declared Mr. Westerman's high blood pressure to be a severe impairment.

At step 2 of the sequential analysis, the ALJ must determine whether the claimant has one or more severe impairments.   This is only a "threshold issue," and, as long as the ALJ finds at least one severe impairment, she must continue on with the analysis.   And, at Step 4, she must consider the combined effect of all impairments, severe and non-severe.   Therefore, a failure to designate a particular impairment as "severe" at Step 2 does not matter to the outcome of the case as long as the ALJ finds that the claimant has at least one severe impairment.   *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012), citing *Castile v. Astrue*, 617 F.3d 923, 927-928 (7th Cir. 2010).

Plaintiff suggests that the high blood pressure readings alone, coupled with the physical therapist's decision to stop the functional capacity evaluation, indicate that Mr. Westerman's high blood pressure was a severe impairment.   She also points out that the cause of death as shown by the death certificate was arteriosclerotic and hypertensive cardiovascular disease.   If she means by this argument to suggest that the ALJ should have assigned additional limitations, she is incorrect.

Mr. Westerman died several months after the ALJ issued her decision.   The ALJ accurately stated that the medical records before her did not contain any evidence of end organ damage or cardiovascular problems due to hypertension. She also noted that the treatment for hypertension was routine and conservative. (Tr. 11).   On the record before her, the ALJ's decision not to assign additional limitations because of high blood pressure was supported by substantial evidence.

Plaintiff's brief quotes a passage from the Mayo Clinic's website describing a hypertensive crisis.   This quote states that "Signs and symptoms of a hypertensive crisis that may be life-threatening may include: severe chest pain, severe headache accompanied by confusion and blurred vision, nausea and vomiting, severe anxiety, shortness of breath, seizures, and unresponsiveness."   Doc. 21, p. 7.   This information has no relevance to this case because there is no evidence that Mr. Westerman experienced any of these symptoms during the period at issue.   In fact, Dr. Walls specifically noted that he denied such symptoms.   The ALJ correctly noted that there was no evidence of end organ damage or cardiovascular problems due to hypertension in the medical records before her.

14

Plaintiff next argues that the ALJ failed to discuss the effect of the tremor in Mr. Westerman's right hand in assessing his RFC. She is incorrect.  The ALJ discussed the right hand tremor in the course of her discussion of the medical expert's testimony.   She noted that Dr. Slodki testified that there was no documentation to support a marked reduction in ability to use the right hand, and noted that Mr. Westerman had returned to work after he developed the tremor.   In addition, Dr. Feinerman had found normal fine and gross manipulations with both hands.  (Tr. 15).   In any event, the ALJ limited claimant to only occasional gross manipulation with the right hand and to only occasional reaching in all directions with the right arm.

Plaintiff argues that the ALJ should have limited Mr. Westerman to occasional fine manipulations and eye/hand movements based on the functional capacity evaluation.   She correctly points out that the ALJ mistakenly thought that the evaluation had been performed by Dr. Walls.   It was ordered by Dr. Walls, but was performed by an occupational therapist, Mr. Vitale.   However, it is hard to see how this mistake could have harmed Mr. Westerman.

An occupational or physical therapist is not an "acceptable medical source." 20 C.F.R. §404.1513(a).   As such, Mr. Vitale's report does not constitute a "medical opinion."   See, 20 C.F.R. §404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources. . . .)"   Mr. Vitale's opinion is not entitled to any special weight under §404.1527(c). SSR 06-03p, 2006 WL 2329939, at *2.   This does not mean, however, that the ALJ may simply ignore such opinions.   The ALJ is required to consider "all relevant

15

evidence" and may, as appropriate, consider the factors set forth in §404.1527(c) in the process of weighing the opinions of nonacceptable medical sources.   SSR 06-3p, at * 4-5.

Here, ALJ Lewin did not ignore the functional capacity evaluation.   She discussed it and assigned little weight to it because it was inconsistent with the objective evidence and diagnostic tests.   It is true that the ALJ did not specifically discuss the limitations in fine manipulations and hand/eye movements.   However, she did point out that Dr. Walls reported normal extremities exams in May and June 2013 and that the functional capacity evaluation noted only minimum to moderate reduced range of motion of the shoulders, elbows, and wrists.   (Tr. 16-17).

Even if the ALJ erred in failing to specifically discuss the proposed limitation to occasional fine manipulations and eye/hand movements, that error was harmless.   An ALJ's error is harmless where, having looked at the evidence in the record, the court "can predict with great confidence what the result on remand will be." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).   In *McKinzey*, the ALJ erred in not discussing the opinion of a state agency physician.   However, the Seventh Circuit held that the error was harmless because "no reasonable ALJ would reach a contrary decision on remand" based on that opinion."   *McKinzey, Ibid.*

Plaintiff's counsel did not ask the VE whether a limitation to occasional fine manipulations and eye/hand movements would preclude the jobs he testified about. The *DOT* descriptions of the three jobs (Usher, *DOT* #344.677-014; Attendant,

*DOT* #349.677-018; Rental Consultant, *DOT* #295.357-018) state that all three require only occasional reaching and handling.   Usher and Rental Consultant require occasional fingering, and Attendant does not require fingering at all.   All three jobs require eye/hand coordination at a level equivalent to "Bottom 10% of the Population - Markedly Low Aptitude Ability."   It would appear that the jobs would not be precluded by the additional limitation and any error is therefore harmless.

Plaintiff's last two points relate to the ALJ's assessment that Mr. Westerman was limited to 15% reduction in left cervical rotation and to 5% reduction in right cervical rotation.    These percentages are based on Dr. Slodki's testimony. Plaintiff first argues that Dr. Slodki refused to provide answers about the reduction in cervical rotation in terms of functional work-related limitations.   She then argues that the hypothetical question posed to the VE was faulty because it asked the VE to assume a 15% reduction in left cervical rotation and a 5% reduction in right cervical rotation which, she contends, are not functional limitations.

Underlying plaintiff's argument about Dr. Slodki's testimony is a suggestion that Dr. Slodki was hostile to plaintiff's counsel.   She characterizes his testimony as "evasive" and says that he interrupted questions and "made snide remarks" during counsel's questioning.   Doc. 21, pp. 8-9.

Plaintiff correctly points out that a social security disability evidentiary hearing is a nonadversarial proceeding.   See, *Nelson v. Apfel*, 131 F.3d 1228, 1236 (7th Cir. 1997).   Dr. Slodki appeared as a so-called "impartial medical expert."   A review of the transcript does not indicate that Dr. Slodki was hostile to plaintiff's counsel, or that he was evasive.   To the extent that plaintiff's point is

17

addressed to Dr. Slodki's cooperation or lack thereof, the point must be rejected.
From a reading of the cold transcript, it does not seem that Dr. Slodki responded to
plaintiff's counsel any differently than he responded to the ALJ.   It can fairly be
said that Dr. Slodki did not go out of his way to be helpful to the claimant, but the
requirement of a nonadversarial hearing is not a requirement that an impartial
medical expert be helpful or friendly to the claimant or his counsel.

Plaintiff's substantive complaint about Dr. Slodki is that he quantified the
limitation in cervical rotation in degrees, and refused to provide limitations in
specific, work related functional abilities.   Doc. 21, p. 9.

Dr. Slodki testified that "All people who have a fusion have decreased range
in rotational ability with the neck.   That usually mostly affects them when they're
driving."   (Tr. 77).   After a few remarks by counsel and by the doctor, the ALJ
took over questioning and asked, "[W]ould there be any functional limitation from
the cervical spine?"   (Tr. 78).

The ALJ and the doctor went back and forth on the question of functional
limitations due to limited cervical rotation.   At one point, the doctor stated,
"[T]hese are really vocational questions," to which the ALJ replied, "Well, we can't
address vocational questions without the functional limitations . . . ."   (Tr. 79).   In
the end, the doctor would only say that the limitations were "mild" and that the
rotation was "45 and 50, where the 60 is normal."   (Tr. 79).   He then
characterized the limitation as "what looks like a 15-percent reduction in left
rotation, and a 10 – what – five percent reduction in the right rotation."   (Tr. 80).

Despite her assertion during the doctor's testimony that vocational

18

questions could not be addressed without first determining functional limitations, the ALJ incorporated Dr. Slodki's characterization of the percentage of loss of cervical rotation into her hypothetical question and into her RFC assessment.[4] The ALJ and claimant's counsel did not ask Dr. Slodki a direct question such as "What effect does the limited range of cervical rotation have on the ability to reach?" or "What effect does the limited range of cervical rotation have on the ability to push or pull?"   Nor did the ALJ make a finding that the limited range of cervical rotation had any particular effect on any work related function.   Plaintiff argues that a limited range of motion is not a functional work related limitation.   Doc. 21, p. 9. The Court agrees.

Basic work activities are "the abilities and aptitudes necessary to do most jobs."   20 C.F.R. §404.1521(b).   Examples of basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling."   §404.1521(b)(1).   RFC is "the most you can still do despite your limitations."   20 C.F.R. §404.1545(a)(1).   That regulation says that, in assessing RFC, the agency is to "consider your ability to meet the physical, mental, sensory, and other requirements of work, as described in paragraphs (b), (c), and (d) of this section."   §404.1545(a)(4).   Assessment of physical RFC is described in paragraph (b) as "When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A

---

[4] The Court notes that plaintiff has not questioned the accuracy of Dr. Slodki's calculation of the percentages, i.e., she has not questioned whether the 15% and 5% figures accurately express Mr. Vitale's measurements of the range of motion on cervical rotation.

19

limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work."

Here, the ALJ did not make a finding as to the effect, if any, of the limitation in range of cervical motion on Mr. Westerman's ability to do the physical demands of work.  The limitation may or may not have any effect beyond that already reflected in the limitation to light work with the assessed reaching limitations. However, that is a determination that must be made by the ALJ based on medical evidence in the record.

The Commissioner argues that Dr. Slodki was not a vocational expert who could opine on the ways in which the cervical rotation limitation would affect claimant's abilities relevant to work activities.   Doc. 29, p. 9.   That argument contradicts the very definition of a medical opinion.   "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, *what you can still do despite impairment(s), and your physical or mental restrictions*."   20 CFR §404.1527(a)(2)(emphasis added).

The Commissioner also argues that the VE was able to apply the neck limitations in considering the ability to perform specific jobs.   Doc. 29, p. 9-10. This argument shifts the responsibility of determining RFC from the ALJ to the VE. Rather than give the VE a specific limitation in one or more physical demands of

20

work arising from the limited cervical rotation, the ALJ left it to the VE to determine same.   An analogous situation would be if the ALJ asked the VE to assume that the claimant had a 15% limitation in lumbar range of motion without specifying any particular limitation in, for example, stooping, crouching or crawling.

The ALJ's failure to make a finding as to the effect of the limitation in cervical rotation on Mr. Westerman's functional abilities was a legal error, and requires remand.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Westerman was disabled or that he should have been awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## **Conclusion**

The Commissioner's final decision denying Curtis Westerman's application for Disability Insurance Benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   August 5, 2016.**

> **s/ Clifford J. Proud**
> **CLIFFORD J. PROUD**
> **UNITED STATES MAGISTRATE JUDGE**

21